[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 19, 2011
JOHN LEY
CLERK

No. 10-12463
Non-Argument Calendar

_____

D.C. Docket No. 5:08-cv-00582-SLB

BENJAMIN L. FLOYD,

Plaintiff-Appellant,

versus

FEDERAL EXPRESS CORPORATION,
d.b.a. Fed Ex Express,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(April 19, 2011)

Before TJOFLAT, HULL, and ANDERSON, Circuit Judges.

PER CURIAM:

Benjamin L. Floyd appeals the district court's grant of summary judgment to defendant Federal Express Corporation ("FedEx"), his former employer, in his action alleging race discrimination, pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e. After review, we affirm.

## I. FACTUAL BACKGROUND

We summarize the facts in the light most favorable to the plaintiff.

**A.     Floyd's Employment**

Plaintiff Ben Floyd is a black male who, at the time of his termination, worked part-time for defendant FedEx on the evening shift. He also worked as a security police officer for the Department of the Army at Redstone Arsenal. At FedEx, Floyd was classified as a "courier," but actually worked as a courier only on Mondays. On Tuesdays through Fridays he worked as a "handler." His schedule, which allowed him to start work at FedEx later on Tuesdays through Fridays, was an accommodation for his day job as a security police officer. The courier position is a higher pay grade than the handler position. Floyd continued to be paid as a courier even after he began working as a handler for four out of the five workdays of the week.

At FedEx, Floyd's immediate supervisor was Scott Hurst, an Operations Manager on the evening shift. Hurst's supervisor was Gary Wade, Senior Manager of Station Operations. Wade reported to Jeffrey Walker, Managing Director of the Delta District, which included north Alabama. Hurst, Wade, and Walker are white.

**B.      Sweeping Trucks**

Floyd and other part-time black handlers were assigned the duty of sweeping 80 FedEx trucks over the course of the week. Floyd, as well as David McNair, Altrice Harris, and O'Shaughnessy Allen, who were all black, part-time handlers on the evening shift, were assigned to sweep the trucks. FedEx assigned the extra duties in order to give each handler sufficient work to fulfill the minimum required hours, which, for a part-time employee, is 17 1/2 hours.

Kevin Bowers, a white part-time handler on the evening shift, was not required to sweep trucks. However, Bowers performed other additional duties related to hazardous materials, and therefore had enough work to fill his mandatory 17 1/2 hours. Another white handler on the evening shift was not assigned to sweep trucks. She was assigned to complete customs paperwork for international shipments.

On April 20, 2006, plaintiff Floyd gave a written statement to FedEx in support of Kelly Deloney, a black employee who had complained that FedEx required her to work more hours than other employees on light duty because she was pregnant. Floyd's statement read, "During the months of October through January 2004 to 2005 I was on TRW [light work duty under FedEx's Temporary Return to Work policy] and was only allowed to work 2 - 3 hours per night." Floyd later testified that the first time FedEx required him to clean out trucks was shortly after he gave this statement in support of Deloney.[1]

At some point, plaintiff Floyd complained to Hurst about black employees being assigned the duty of cleaning out the trucks. Floyd told Hurst that "Rita [Howard] said that Gary [Wade] was trying to get rid of the black people." Floyd later testified that he heard Howard, a black manager, as well as Scott Hurst, say that Gary Wade had said he "was trying to fire all the black people."[2]

---

[1]Floyd admitted that he received a "Letter of Expectations" from Scott Hurst, dated January 4, 2006, which listed cleaning trucks as one of his assigned duties. However, Floyd claims that he and the other employees were not required to clean out the trucks between January 4, 2006 and April 20, 2006. For the purposes of summary judgment, we assume that Floyd was only required to sweep trucks after giving his statement in support of Deloney on April 20, 2006.

[2]In July 2006, Altrice Harris filed an internal complaint with FedEx, alleging that on October 21, 2005, Howard, a black manager, allegedly said to Harris, "Did you know that [Wade is] talking about wanting to take your job and get rid of you! You know he's trying to get rid of as many black folks especially[.] Gary is talking about putting [sic] someone white to replace you." (Capitalization omitted.) Howard denied making the statement. On August 31, 2006, FedEx sent Harris a letter, stating that, after an investigation of her claims, it had found no policy violations.

On a couple of occasions, plaintiff Floyd also complained about cleaning the trucks to Judy Parker, an employee in FedEx's Human Resources Department. Floyd told Parker that he had heard from both Rita Howard and Scott Hurst that "Wade said that he was trying to fire the black people."

## C.     Floyd and Bowers Incident

On the evening of August 31, 2006, Bowers, a white handler, saw David McNair, a black handler, loading a container onto the trailer of an eighteen-wheeler truck. According to plaintiff Floyd's testimony, Bowers assumed that McNair needed help. Bowers saw McNair struggling with the can while trying to push it into the truck.

Bowers left his work station and went to help McNair. As Bowers passed plaintiff Floyd, he called Floyd a "sorry mother-fucker" and told him he was "lazy." Bowers did not use any racial epithets. Bowers proceeded to the truck and helped McNair push the can into the truck. Plaintiff Floyd testified that he also helped McNair push the can into the truck.[3] Because the can was one of the first cans loaded onto the truck, it was pushed deep into the trailer.

---

[3]Bowers testified that plaintiff Floyd, while on the telephone, was watching McNair. Both McNair and Bowers, in statements given on the day of the incident, stated that plaintiff Floyd did not help load the can. On summary judgment, however, we must construe the facts in a light most favorable to Floyd, and we assume that he helped McNair and Bowers load the can into the truck.

Plaintiff Floyd testified that Bowers pointed his finger at Floyd while they were inside the trailer, so close that if Floyd had not stepped back, "he would have put his hand in my face." Floyd pushed Bowers's hand out of his face. At that point, McNair grabbed Bowers. Floyd testified that he did not take a swing at Bowers and that Bowers did not throw a punch at Floyd.

Several other employees witnessed the incident between Bowers and Floyd, including Altrice Harris, Sheyla Abston, and Dennis Mitchell. Harris, Abston, and Mitchell are all black. Only plaintiff Floyd, Bowers, and McNair were inside the truck during the incident.

That night, Bowers reported the incident to Hurst. Bowers told Hurst that Floyd had taken "a swing at him and grazed his chin, [and] hit him in the arm. And then David McNair broke it up and walked [Floyd] out of the trailer." That night, Hurst interviewed Floyd, Bowers, McNair, Harris, and Abston. Hurst's interview notes did not mention any physical contact between plaintiff Floyd and Bowers; however, Hurst noted that McNair told him that plaintiff Floyd "took a swing at" Bowers. McNair later testified that he had not seen any physical contact between Bowers and Floyd, but he did see Floyd take a swing at Bowers. McNair did not know whether Floyd made physical contact.

6

According to Hurst's interview notes, Floyd told Hurst that Bowers had asked Floyd why was his "sorry ass" not helping McNair and that Floyd had followed Bowers, saying, "[You're] not my boss." Harris told Hurst that Floyd and Bowers "cussed each other out but no punches, no [g]estures, [and] no fighting." In a follow-up statement, Harris told Hurst that she had seen Floyd and Bowers arguing and that McNair "was in [the] middle."

That same night and the following day, Hurst received written statements from Floyd, Bowers, McNair, Harris, and Abston. None of the written statements explicitly stated that Floyd hit Bowers, although both McNair and Bowers stated that Floyd had taken a "swing" at, or attempted to hit, Bowers. Floyd's statement indicated that during the confrontation, Bowers told him he was "lazy" and "I told him that [Bowers] was not my boss and I don't need to hear his shit. He went [on] talking and that [was] when Dave [McNair] got between us." Floyd's statement did not mention any physical contact between himself and Bowers, nor did it mention that Bowers had pointed his finger at Floyd.

Bowers's statement indicated that while he was helping McNair load the can, "[B]en [Floyd] came up behind me and took a swing at me."

McNair's statement indicated that, after McNair and Bowers loaded the can into the trailer, Floyd confronted Bowers and "[t]he argument escalated to the

7

point that [Floyd] attempted to hit [Bowers], at which point I stepped in between [Floyd] and [Bowers] to prevent any physical contact between these two individuals."

Abston and Harris also submitted statements. Abston stated that she saw Floyd and McNair arguing in the truck and McNair in between them, but she did not see "any punching, or swinging, or hitting of any sort." Harris stated that she saw Floyd and Bowers "arguing loudly." Harris's statement did not mention any physical contact. Harris later testified that she witnessed the altercation, but she did not see Floyd, Bowers, or McNair while they were inside the truck.[4]

## D.     Floyd's Termination

Hurst suspended Floyd the same night as the altercation. Because Bowers had already clocked out and left, Hurst suspended Bowers the following morning before Bowers's shift began.

Hurst and Wade then reviewed the written statements, Hurst's notes, and Hurst's recollection of Bowers's oral report of the incident. Wade and Hurst, in consultation with Parker, decided to terminate Floyd. Wade testified that he

---

[4]On September 11, 2006, after Floyd had appealed his termination internally, Dennis Mitchell also gave a written statement that he "only saw [a] verbal exchange between [] Floyd & [] Bowers. They were facing each other but no pushing, only verbal exchange between the two."

8

credited the statements of McNair and Bowers because they were the only witnesses inside the trailer.  He testified that because Abston and Harris were outside the truck, they would not have been able to see the altercation.  Hurst testified, "The only three people who knew exactly what happened [were the] only three people in the trailer."

Several days later, on the morning of September 5, 2006, Wade sent an e-mail to Walker and Judy Parker, stating:

> In questioning the person who was swung at Friday, the swing did land a glancing blow on him as he turned away from the swing.  The other handler who witnessed it said, that if it did hit him it was not straight on due to the fact he turned away as he saw the swing coming.  So their stories back each other up and they were given independent of each other.
>
> Looks as if this only solidifies the termination of the handler who swung (but denies it).  We also will proceed with a warning letter for the person who was swung at for cursing at the other handler during this incident.
>
> I plan to move forward with both today.

That same day (September 5, 2006), Hurst terminated Floyd for striking Bowers.  The termination memorandum from Hurst to Floyd stated, "After a thorough investigation, it has been determined that you are in violation of Acceptable Conduct, 2-5.  Specifically, you struck a fellow employee after a

9

verbal confrontation.  Therefore, the decision has been made to terminate your employment effective September 5, 2006."

The same day Floyd was terminated, Hurst sent Bowers a warning letter "for using profanity toward another employee."  The letter also stated, "This is a [v]iolation of Acceptable Conduct 2-5 of the People Manu[a]l."

Hurst later testified that he did not become aware of Floyd's allegation that Bowers had put his finger in Floyd's face until much later, sometime between August 2008 and February 2009.

## E.    FedEx's Review of Floyd's Termination

Plaintiff Floyd requested a review of the termination decision under FedEx's "Guaranteed Fair Treatment" policy.  As part of the review, Parker requested an additional written statement from Bowers to clarify whether Floyd actually made physical contact with Bowers.  On September 8, 2006, Wade asked Bowers for a second statement.  Bowers's September 8, 2006 statement stated, in part, "Ben Floyd came onto the trailer we were loading.  As we turned from securing the ULD and started to exit the [trailer] Ben took a swing at me with his right arm, closed fist making contact with my lower chin and grazing my right arm."

10

On November 10, 2006, defendant FedEx concluded the review and found no policy violations. Plaintiff Floyd filed an EEOC charge, alleging FedEx terminated him based on race discrimination and retaliation.

## C.   Floyd's Lawsuit Against FedEx

Plaintiff Floyd filed suit in district court against FedEx, alleging that FedEx violated his rights under Title VII and 42 U.S.C. § 1981 by terminating him because of his race and in retaliation for his prior participation in Deloney's discrimination claim. Floyd sought (1) a declaratory judgment that FedEx's employment policies and practices violated his rights, (2) reinstatement to his former position, (3) back pay with interest, and (4) punitive damages. FedEx answered, claiming that its actions were based upon legitimate, non-discriminatory, and non-retaliatory factors.

Following discovery, FedEx moved for summary judgment on both the discrimination and retaliation claims, which the district court granted. The district court concluded, inter alia, that Bowers was not a similarly situated employee because Bowers did not hit or attempt to hit Floyd. Because Floyd did not demonstrate favorable treatment of similarly situated white employees, he did not establish: (1) a prima facie case of racial discrimination, or (2) an issue of fact regarding FedEx's nondiscriminatory reason for his termination. Second, even

11

assuming that Floyd established a prima facie case of retaliation, he failed to

establish that FedEx's stated reason for his termination was pretext. Floyd

appeals.[5]

## II. DISCUSSION

## A.    Prima Facie Case of Racial Discrimination

Floyd has not introduced any direct evidence of racial discrimination, but

relies on circumstantial evidence. To establish a prima facie case of disparate

treatment, the plaintiff must show: (1) he is a member of a protected class; (2) he

was subjected to adverse employment action; (3) his employer treated similarly

situated employees outside of his class more favorably; and (4) he was qualified to

do the job. McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir. 2008); accord

Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).

To determine whether employees are similarly situated in a case involving

discriminatory discipline, we evaluate whether the employees were accused of the

same or similar misconduct and were disciplined differently. Burke-Fowler v.

---

[5]"We review a grant of summary judgment de novo, using the same legal standard as the district court," and viewing the facts in the light most favorable to the nonmoving party. Merritt v. Dillard Paper Co., 120 F.3d 1181, 1182, 1184 (11th Cir. 1997). Summary judgment is appropriate if the pleadings, depositions, and affidavits show that "there is no genuine dispute as to any material fact" and that the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

Orange Cnty, Fla., 447 F.3d 1319, 1323 (11th Cir. 2006). We require "'that the quantity and quality of the comparator's misconduct be nearly identical'" to the disciplined employee's misconduct. Id. at 1323 (quoting Maniccia, 171 F.3d at 1368). Misconduct merely "similar" to the misconduct of the disciplined plaintiff is insufficient. See id. at n.2.[6]

Having viewed the evidence in Floyd's favor, we conclude that Floyd failed to establish that Bowers was a "similarly situated" employee who received more favorable treatment than Floyd. Even absent any physical contact between Floyd and Bowers during the altercation, Bowers is not a proper comparator because the record indicates that Floyd attempted to hit Bowers during the exchange, while Bowers used profanity and pointed at Floyd. At the time that Hurst fired Floyd, Hurst had the following evidence that Floyd had attempted to hit Bowers: (1) Bowers's oral report, given immediately after the incident, (2) Hurst's interviews with Bowers, McNair, and Floyd, and (3) the written statements of Bowers, McNair and Floyd. The other employees interviewed by Hurst were not present in

---

[6]As we explained in Burke-Fowler, although the panel decision of this Court in Alexander v. Fulton Cty., Ga., 207 F.3d 1303, 1334 (11th Cir. 2000), called into question the "nearly identical" standard for misconduct stated earlier in Maniccia, we are bound to follow Maniccia's "nearly identical" standard rather than the standard articulated in Alexander. See Burke-Fowler, 447 F.3d at 1323 n.2 (citing Walker v. Mortham, 158 F.3d 1177, 1188-89 (11th Cir. 1998) (holding that when a later panel decision contradicts an earlier one, the earlier decision controls)). Thus, to the extent that plaintiff Floyd argues that the district court used the wrong standard in this case because it followed the "nearly identical" standard, this argument fails.

13

the trailer at the time of the altercation; Harris specifically testified that she did not see Bowers, McNair, and Floyd while they were inside the truck.

Plaintiff Floyd argues that (1) none of Hurst's interview notes or the written statements submitted by the witnesses indicate that there was any physical contact between Floyd and Bowers during the altercation, and (2) both Bowers and Floyd were charged with violating section 2-5 of FedEx's "People Manual," entitled "Acceptable Conduct," but Bowers was given only a written warning while Floyd was terminated.

Plaintiff Floyd makes much of the fact that, prior to his being fired, there was no documentary evidence that he made physical contact with Bowers. However, he does not dispute that the record indicates that Bowers and McNair repeatedly told Hurst that Floyd took a swing at Bowers. Even absent physical contact, Floyd's conduct in swinging at Bowers is not "nearly identical" to Bowers's use of profanity. Moreover, the mere fact that Bowers and Floyd were ultimately cited for violating the same provision of FedEx's People Manual does not made their conduct "nearly identical." Section 2-5, entitled "Acceptable Conduct," includes a long list of violations of company rules which "may result in severe disciplinary actions up to and including termination." These violations include a range of behaviors such as theft, fighting, and fraudulent activity.

14

Floyd's argument that FedEx's manual somehow indicates Bowers's use of profanity is "nearly identical" to an attempt to strike an employee fails.

Plaintiff Floyd also argues that he and Bowers committed the same or similar misconduct because Bowers put his finger in Floyd's face during the altercation, forcing Floyd to lean back in order to avoid physical contact, which a reasonable jury could conclude was Bowers's attempt to hit Floyd. However, Floyd himself testified during his deposition that Bowers did not attempt to hit Floyd. There is no other indication in the record that Bowers attempted to hit Floyd when he put his finger in Floyd's face, nor did any of the witnesses tell Hurst that Bowers attempted to hit Floyd. Importantly, there is also no indication in the record that Hurst or the other decisionmakers knew that Bowers put his finger in Floyd's face prior to terminating Floyd. Even taking the evidence in favor of Floyd, we conclude that this fact alone cannot create a disputed issue of fact as to whether Bowers and Floyd are "similarly situated."

## B.    Pretext

Alternatively, even assuming Floyd established a prima facie case, we also conclude that Floyd failed to establish a genuine issue of fact regarding whether FedEx's proffered reason for his termination was a pretext for discrimination or retaliation. Once a plaintiff has established a prima facie case, the burden shifts to

15

the employer to articulate a legitimate, nondiscriminatory reason for its action. Burke-Fowler, 447 F.3d at 1323. If the employer meets its burden, the presumption of discrimination is rebutted, and the burden shifts back to the employee to show that the employer's alleged reason was pretext for discrimination. Id.

To show pretext, the plaintiff must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Wascura v. City of South Miami, 257 F.3d 1238, 1243 (11th Cir. 2001) (quotation marks omitted). The ultimate issue regarding pretext is not whether the employee actually violated the rule, but whether the employer believed that the employee violated the rule. Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991). We do not judge whether the employment decision was fair or prudent, but only consider whether an unlawful discriminatory animus motivated the challenged employment decision. Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999).

Given that Bowers is not a "similarly situated" employee, Floyd's attempt to establish pretext based on a comparison of his and Bowers's disciplinary treatment

is insufficient to raise a genuine issue of fact. Moreover, Floyd has offered no other evidence to show that FedEx's justification of his termination is unworthy of credence. Floyd argues that Hurst, Parker, and Wade believed Bowers, a white employee, over the other black witnesses who gave statements. However, Wade and Hurst testified that they believed Bowers and McNair (a black employee) over the other employees because Bowers and McNair were the only two witnesses besides Floyd who were in the trailer at the time of the altercation. The record contains no indication they credited Bowers and McNair due to race.

As further evidence of pretext, Floyd contends: (1) Wade asked Bowers to revise his written statement after Floyd was terminated and did not obtain a second statement from any black employee, and (2) Floyd had heard from Rita Howard, a black manager, that Wade said he is "getting rid of all the blacks." These facts are insufficient to establish pretext.

The fact that Wade asked Bowers to submit an additional statement during the internal review of Floyd's termination does not establish pretext. The second statement was obtained from Bowers after the decision had already been made to terminate Floyd, and therefore cannot show that the reasons FedEx stated at the time Floyd was terminated were a pretext. Moreover, Floyd does not dispute that, on the night of the altercation, Bowers told Hurst that Floyd's swing had grazed

17

his chin and hit him in the arm. Our inquiry is limited to whether Hurst believed that Floyd had struck or attempted to strike Bowers, and if so, whether this belief was the true reason behind Floyd's termination. See Elrod, 939 F.2d at 1470 (inquiry is limited to whether employer believed employee was guilty of misconduct, and if so, whether that was reason behind discharge; that employee did not actually engage in misconduct is irrelevant); accord Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010). Furthermore, in reaching an employment decision, an employer is free to weigh the credibility of different witnesses, "as long as the choice is an honest choice." EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000).

Wade's alleged comment, which Floyd says Hurst and Howard said Wade said, also is insufficient to establish pretext. To the extent that Floyd argues that Wade's alleged comment somehow provides direct evidence of discrimination, this argument fails, because there is no evidence that Wade's comment was in any way related to Floyd's termination. See Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1227-28 (11th Cir. 2002) ("To be direct evidence, the remark must indicate that the employment decision in question was motivated by race."). As circumstantial evidence, Wade's alleged statement to Howard is non-probative because it is too remote from the decision to terminate Floyd—Wade's statement

was made in October 2005, almost a year before Floyd was fired in September 2006—and because it was made to another employee about an incident completely unrelated to Floyd. Without any additional evidence of pretext, Wade's comment to Howard is insufficient to establish pretext as to Floyd's termination. See Scott, 295 F.3d at 1229 ("Although a comment [that "[w]e'll burn his black ass"] unrelated to a termination decision may contribute to a circumstantial case for pretext, it will usually not be sufficient absent some additional evidence supporting a finding of pretext." (internal citation omitted)); Rojas v. Florida, 285 F.3d 1339, 1343 (11th Cir. 2002) ("Because [Rojas's supervisor's] alleged comment [to another female employee that she did not deserve her job because she was a woman] was . . . an isolated comment, unrelated to the decision to fire Rojas, it, alone, is insufficient to establish a material fact on pretext.").[7]

Because Floyd points to no other evidence in the record to support his contention that FedEx's termination of him was either based on race or in retaliation for his prior statements, we conclude that the district court properly concluded that Floyd failed to rebut FedEx's proffered reasons for his termination.

---

[7]Alternatively, Wade's statement involves multiple layers of hearsay, and is therefore inadmissible to show pretext. See Alvarez, 610 F.3d at 1268 n.10 (noting that plaintiff's testimony that she heard from other employees about supervisor's discriminatory remarks is inadmissible and cannot be used to show pretext); Rojas, 285 F.3d at 1342 n.3 (noting that plaintiff's testimony that she heard about her supervisor's discriminatory comment from a coworker was hearsay inadmissible to show pretext).

In summary, because Floyd did not set forth a <u>prima facie</u> case of race discrimination and failed to demonstrate that FedEx's stated reason for terminating him was a pretext, the district court did not err in granting summary judgment.

**AFFIRMED.**